We next reach the matter of this, I'll characterize it or abbreviate a caption, McMunn, Myers v. Babcock and Wilcox. In the history of the nuclear power industry in this country, only one nuclear fuel processing facility has ever been situated in the middle of a town adjacent to a residential area, the Newmeck plant in Apollo, Pennsylvania. Only one plant has been cited as the worst offender of Atomic Energy Commission regulatory requirements. By definition, only one could be cited as the worst offender. That is correct, Your Honor. Unlike most of these plants, this plant was an old steel mill that was revamped into a nuclear fuel processing facility near yards from places where people lived. Let me ask you a very basic kind of caption related question. This is not a class action. How many individual plaintiffs are there in this consolidation? Your Honor, I'm not precisely sure. I think it's between 73 and 80. I believe that's correct, Your Honor. Under the CMO that was adopted pursuant to the Price-Anderson Act, the cases were consolidated solely for pretrial purposes on common questions before Judge Sircone, the plan, assuming we were to succeed in getting these cases sent back, is that they will then be returned to their originally assigned judges for purposes of trial. Walk me through your causation argument, given the dichotomy between the deliberate opinion and the summary judgment opinion. I'm sorry, Your Honor. Walk me through your causation argument. I think the causation opinion, well, let me first say, Your Honor, on causation and also on breach of duty, what's striking here is that we've had four separate rulings, prior rulings by the District Court, two in the Hall case, and in this case, both the Lone Pine Order and the Daubert ruling, that found that we had made a prima facie case on all these issues, and only then, when the magistrate recommended a summary judgment, did the court reverse itself. I can offer some thoughts on that at some point. Speaking to you specifically about causation, under TMI, we need to show that the plaintiffs were exposed to radiation. In excess of background. In excess of background, yes, Your Honor. Radiation, specifically from the plant, and that that- Can you make sure that each is a specific amount of exposure for each individual plaintiff? We do not, Your Honor. As TMI, I think, makes clear, Judge McKee can correct me if I'm wrong- This is something I hoped I had forgotten. Because any level of radiation exposure in excess of background can be causative, given the stochastic nature of cancer and the lack of any signature evidence, there is no minimum dose required in order to establish causation. The problem is, and I probably should ask your opponents this, I think you're right, and speaking for myself in terms of the requirement of doses, when you said exposure in any amount over background radiation, but in some individuals, and this is my problem with these cases, not to suggest one way or the other, but just in concept and in theory, exposure to background radiation, and nothing beyond background radiation, in a certain segment of the population, will produce cancer. So how in the world, unless there's some cognizance of that, and the difficulty of causation here, unless courts somehow recognize that, how does anybody ever get past summary judgment in these cases? Well, I think the answer, Your Honor, focuses on the fact that the effect increases with dose. But it's only probability. It is only probability, and under Pennsylvania law, the legal standard is substantial contributing factor and not the sole cause. Let me stop you right there, because before we get too far down the track, you mentioned Pennsylvania law. This is a public liability case, of which there are not a lot out there. And, in fact, with respect to this matter, I mean, it's safe to characterize it generally as a negligence sort of a case. Right? It's not the way the district court characterized it, but yes. Well, except that, I mean, federal law obtains here with respect to determination of the duty, right? Right, and we have to show breach of duty. But in all respects, otherwise, this is a basic common law negligence, doing breach of duty, causation, and damages. I would agree with that, Your Honor. Right. All right. Returning then to the causation question that Judge Restrepo began with, your argument, as I understand it, is that your clients need only show exposure. They don't have to show anything with respect to dose. Is that correct? That is correct, Your Honor. We need to show exposure specifically from radiation emitted from Apollo, and we believe we've done that. So the upshot of that would be, tell me if I'm wrong, that a single particle emitted in excess of regulatory requirements or regulatory guidelines then would be enough. Is that right? If it's in excess of regulatory guidelines, it would be sufficient to establish breach. We do need to establish causation. The question is how to establish causation. All right. So it's not your argument that that would be enough to demonstrate causation. No. And, indeed, there were plaintiffs who wanted to be in this case who are not in this case because our expert was not prepared to opine that radiation from Apollo was the source of their cancer. Is that Dr. Mellius? Yes. Well, if what you just said, doesn't that bleed over into dosage? Because it's not just, you've got to show more than exposure, but you've got to show the intake, the impact of that exposure on the cellular structure of the individual, the plaintiff. So doesn't that get you to, and unless you get somebody to monitor the dosage. It doesn't get you to quantitative dosage. The whole notion of a differential diagnosis is a qualitative examination of various factors that may potentially be explanatory of the symptoms exhibited by the plaintiff. In this case, Dr. Mellius, as he had done in the Hall case, evaluated individual plaintiffs based upon their medical histories, based upon their symptoms, based upon their exposure histories, how many years they had lived in Apollo, where they lived, where they worked in relation to the plant, to make an assessment about, and what other conditions they might have, or lifestyle behaviors, whatever, that might contribute to cancer, in order to make an assessment about whether in that particular plaintiff's record, there was a reasonable degree of medical certainty that the radiation was a substantial contributing factor. Of all the plaintiffs who are in this consolidated appeal, what are the different types of cancers alleged? Your Honor, I believe there are 22 different cancers that have been identified in the research and by Dr. Hu, I believe in his testimony, as being radiation-induced. The plaintiffs all fall within those categories. I can't tell you whether we have all 22 covered. You take your plaintiffs as you find them, but they are all forms of cancer that have been linked to ionizing radiation in the epidemiological literature. Is there anything in this record to demonstrate statistically that any of the plaintiffs' cancers that are present here occurred more frequently in the Apollo area than in the general population? There is, Your Honor. Dr. Melius testified. There's a study that was done by the Pennsylvania Department of Health, which purports to find no increase in cancer in the Parks plant area and the Apollo area. Dr. Melius testified based upon reanalysis of that data and looking at subset data specifically related to people who lived in proximity to the Apollo plant, a statistically significant increase in the incidence of cancer. Now, differential diagnosis is and has been repeatedly recognized as an acceptable form of proper form of medical diagnosis. As to causation, this Court has recognized it on numerous occasions and upheld it. Indeed, Dr. Melius serves on the National Radiation Employees Board that evaluates whether employees at nuclear plants are entitled to compensation for their injuries, which specifically requires making assessments about whether it is, you know, based upon the fact that it's reasonable to assume that their cancer was caused by exposure to radiation, and that's exactly what he did here. He did not do a dose reconstruction. He didn't need to. How did he do that? Do you have the data? No, they don't have the data, Your Honor. Why don't you have the data? Hmm? Why don't you have the data? Well, they don't have the data because the data that the plant maintained is so minimal and has so many gaps. That's what I'm getting at. Did they comply with a regulatory obligation that would be on a nuclear plant to maintain certain release data and expose the data that really could be exposed to data by extrapolation out to the boundary? I believe there's documentation that they specifically were in violation of much of their documentation record, although I can't tell you whether there are documents that existed in the time that the plant was in operation that no longer existed at the time this litigation began. Let's come back to the duty. Is that the source of the duty? No, absolutely not, Your Honor. Where does the duty arise from? I will answer that in one second, Your Honor. I just want to, before I leave, the issue of causation. It's important to remember that in the Daubert opinion, Judge Sircone recognized that the data on the dose reconstruction that had been used in the Hall case was not grotesquely understated, the likely exposure, because of the inadequacies in the data. And for that reason, he specifically found in upholding Dr. Mulius' testimony in the Daubert ruling that on these facts, a quantitative dose assessment might well be more speculative than a qualitative assessment. And I think that's a critically important element of that holding. I'm about to run out of time. Let me speak to the breach question. Know that none of the plaintiff's claims relate to record keeping. Plaintiff's claims are entirely about breach of federal regulatory requirements on the amount of uranium that may be released from the plant. Is that where the duty comes from, compliance with those regulations? It comes from two sources, Your Honor. It comes from 2106, which as this court said in TMI, is the regulation that sets standards for exposure for emissions from nuclear facilities to unrestricted areas outside the plant. It also comes from the requirements of the company's license with the Atomic Energy Commission, which is enacted pursuant to its statutory authority to set the associated requirements. Are there any cases that suggest that a duty may arise from a license or from a language in a license? Well, Your Honor, the cases that defendants cite against that proposition all relate to license requirements that did not specifically relate to that. I'm not asking about the negative. I'm asking if there are any to support your position. Your Honor, I can't quote you on this one. I feel that there are, but I cannot cite you to one for this one. Could you quote me, Jim, after this and serve your opponents with that after that? Certainly. Thank you, Your Honor. Thank you very much. We'll have you back on rebuttal, Mr. Legrad. Mr. Phillips? Mr. Phillips, could I just start by asking for clarification of something? I'm not sure the record is clear about. It seems that the Atomic Energy Commission had some particular interest in this facility back in the 1960s. In fact, I think there were a number of communications back at that time relative to the stacks. Weren't there? The AEC has an inspection protocol that applies to facilities like Apollo. The analysis of the stacks and releases ties into the duty of care issue, which as court in 1995 held in TMI is set solely by the regulations in 20.105 and 106. That's the duty of care issue that my colleague, Ms. Milburn, is going to address in the time allotted to her. I was actually more interested in the nature, factually, of what this interest the AEC had and what it was about. But if that's not clear or if you don't have a response, we can move on. Well, Your Honor, briefly, it's not that the AEC took particular attention to the Apollo facility. There is a pervasive regulatory scheme that applies to every licensed commercial facility and to fuel processing facilities like Apollo. It was pursuant to that regulatory scheme that the AEC was present at the site, conducted inspections, assessed compliance with various rules and regulations, including assessing releases from the stacks and from other discharge points. Weren't there problems in the AEC's interest that NUMET wasn't maintaining the kind of records regarding discharge that the AEC wanted them to and that they were required to keep? Your Honor, I listened to plaintiff's counsel and noted that none of plaintiff's claims relate to the absence of records and they have no evidence in the record that... Let me try the question again. Yes, sir. I'll summarize the question. Maybe it is sort of that way. Did NUMET comply with the obligation to maintain records in terms of its discharge? We believe that NUMET complied with its regulations and that the records existed to apply the relevant scientific principles that exist. So it monitored discharge? Pardon me, sir? The monitoring was done of its discharge from the stacks. There was extensive monitoring of the stacks and of various release points at the facility and as we demonstrate in our briefing, the evidence shows compliance with 20.106 on an annual basis. And 20.106 requires averaging on at least an annual basis, I think it is. Yes, Your Honor. As Ms. Milgram will address, it does permit annual... Well, probably everything, Harry. Not everything. Not everything, but... Dr. Melius' testimony, right? Yes, sir. We have an opinion from the district court where he writes, Dr. Melius has demonstrated good grounds for his opinion that the exposure to radiation emitted from the Apollo plant was a substantial contributing factor in the development of Plankton's cancers. It's the district court's opinion. How do you reconcile that with the summary judgment opinion? The district court's opinion that you just read from was rendered in the context of a Daubert rule. I understand that. So how do you reconcile that with what happened at the summary judgment opinion? I reconcile it by noting that the court, in the summary judgment context, did what it's obligated to do and tested the foundation for that evidence and determined that Dr. Melius did not have sufficient foundation for his testimony. That's a Daubert issue. Didn't the district court take it a step further at summary judgment and step into the jury's shoes? We don't believe so, Your Honor. The district court looked at the admitted facts that are at 4831 through 4838. We filed a motion to have facts deemed admitted. That motion was granted because it was unopposed, and that's the record before the court right now. Those unopposed facts demonstrate the following, that there is no evidence connecting a single plaintiff to a release of uranium from the Apollo facility. None of plaintiff's experts have a single opinion on that point. Not a single expert or plaintiff has an opinion that complies with this court's opinion in 1999 in TMI that they prove an exposure in excess of the annual background levels that we all receive every year. The only expert who... But you agree that 1999, the 1999 TMI... Yes. That does not require a dose. No, I believe it does require a dose. It does require a dose. Yeah, for four reasons. First, the public liability action notes that you need to adopt state law that's consistent with the act. BESS is the Pennsylvania Supreme Court case that requires dose. How would you ever prove that? How could you ever prove a dose that someone... Assuming you had all the data in terms of discharge... Let's say the discharge to the boundary, because I'm not sure how you get past that... Sure. Unless people are wearing... Every citizen of the town is wearing a meter on their sleeve to register the doses they're getting over a period of time. So you measure those to the boundary. A lot of that's done by extrapolation based on what's coming out of the stag and looking at prevailing winds and everything else. Then you've got to find out when they're on vacation. How often did they vary X number of miles from their house? How in the world could you possibly prove dosage? Your Honor, there are several dose reconstruction projects that have been done around the country at various facilities at Hanford and... So how is dose at every individual plaintiff? You take the first step, Your Honor, of determining the source term. In other words, how much radioactive material was released by a facility during a given year. You then apply atmospheric transport models, which are well described in the scientific literature. You then look to the dose coefficient... Transport to where? Transport to where the individual plaintiffs reside using meteorological data, topographical data from the United States Geologic Service. You then take that data and you use the ICRP models, which Your Honor cited too extensively in the 1999 TMI opinions, which have been around for decades, that show exactly where various radionuclides go in the body. But you've got to show... When you get to where they go in the body, then you've already assumed a certain points of illegal disruption. That's true. To get to that point, you've got to know when did they go shopping? How long did they spend in the grocery store? The movie theaters they went to, was that in town or out of town? How far was that from the release point? Did they drive their car with the windows up or the windows down? You see what I'm getting at. I am, but it doesn't... To get to the individual dosage, it's almost impossible, isn't it? It's not impossible, Your Honor. It's done. In fact, we did it. We had two sets of experts do that kind of analysis in this case. There is an established body of scientific literature on environmental dose reconstructions doing just what Your Honor talked about. It doesn't get to the granular level of figuring out whether someone was riding down the street with the window down. But you do and have the capability of analyzing how much was released from a facility source, transport, where did it go within various quadrants using well-accepted scientific dilution factors and things like that, how much could a person inhale, how much we inhale every day is known, and then calculate... There's got to be presence to inhale it. Sure. And if we know that somebody lived in a certain quadrant near the Apollo facility for a certain number of years and then worked in an area that could not possibly have been exposed to any uranium released from that facility, you subtract that out. And they vacationed in Vermont. If they vacationed in Vermont for three months... So for three months and one year, they didn't go to Vermont. And wait until they went to Vermont, for a certain period of time, on their way to Vermont, they were in the discharge area. You can get to it in terms of probability and likelihood. Maybe that's why you're arguing and suggesting you have to do it. But you get the actual quantitative dosage. I just don't know how you could possibly come up with all those variables and the considerations you're citing couldn't possibly go to them because the number of variables are infinite. Your Honor, the scientists do it all the time. It doesn't mean they're right. Well, it doesn't mean they're right, but these are published in peer review. They come up with probability. They come up with probabilities and then they calculate doses. And as this Court stated repeatedly in 1999, the probability of a stochastic event like cancer occurring is a function of the dose. The National Academy of Sciences, the National Council on Radiation… Well, no one's arguing that. The problem here is, and again, this takes up with your power, maybe I should ask you, how in the world would any planet ever prevail? Let me run back into it. I think you'll concede, but I don't concede that it applies to your planet. There are situations in which, say you have a neighbor A and neighbor B. They're both exposed only to background radiation. Neighbor A develops a certain cancer caused by the background radiation. Neighbor B doesn't. They're both exposed to exactly the same dose of radiation. You'd agree that's not only possible, but that happens all the time. We're not talking discharge from a nuclear facility. It's just background radiation. So you could agree that happens. I don't agree that happens. You don't agree that that happens? The background radiation causes a cancer that you might have that Judge Smith wouldn't? You're not suggesting to any non… no environmental factors beyond what's in the environment. You're saying that that does not… Well, this is really good news for the cancer… People in Colorado receive around 2 rem a year compared to people at sea level who receive around 300 millirem a year. And the reason is because they're closer to the sun. That's background radiation. True, and I thought your question was, does background radiation cause cancer? That was the question. There aren't studies that demonstrate that. We're all exposed to… 2 percent of the people in Colorado who live at a certain elevation as opposed to others who live at a lesser elevation have a greater chance of developing cancer based upon background radiation? No, I did not, Your Honor. What I said was that there's a difference in the background exposures that people receive depending on where they live. I agree with that. And in this case, the plaintiffs were obligated to first have an opinion about what that is, and then under this court's authority in TMI, they were obligated to show what the exposures were in excess of the background. Not a single plaintiff expert made any attempt to quantify that. In order to do any comparison whatsoever. Dr. Milius had an opinion that one millirem is a significant exposure, but that's well within the range. It's less than what I got flying out here to meet with you today. He also had an opinion that he has no lower bound, no lower exposure estimate for any plaintiff. The combination of those facts preclude any ability to comply with this court's requirements. We believe it's… So do you know of any case, any one of these background plus radiation cases, where any plaintiff or group of plaintiffs have gotten past summary judgment? Has it ever happened, Your Honor? You mean for where members of the public have brought claims? Your Honor, we do know from TMI that… Well, that was in my… In my TMI, that was a deliberate issue. Solely a deliberate issue. It was, and when the court excluded that evidence, which we submit is the functional equivalent of the absence of the evidence here, under the undisputed facts, it then entered summary judgment. And in that case… So in that case, no plaintiff was able to get past summary judgment. There was no evidence. That's correct. And as we demonstrate, I think crisply in our briefing, there are three requirements from this court's TMI opinion. You have to have exposure in excess of background. Do you know of a situation where any plaintiff or group of plaintiffs has ever gotten past summary judgment in one of these kinds of cases? I'm not getting into why that is. Has it ever happened, Your Honor? In terms of getting a jury verdict, Your Honor, I… Getting to a jury. I'm just not versed in it. I'm not familiar with the case where that happens. But, again, there is fundamental science that permits plaintiffs to proceed in a case where they have a sufficient record. And there are three requirements that this court set forth in TMI. And the admitted facts at 4831 through 4838 demonstrate beyond dispute that the plaintiffs lack the evidence of exposure in excess of background, any exposure at all, exposure to this radiation, which is quite clear, must be the radiation released in excess of 20.106, and any evidence of dose. This court held repeatedly, we think, that evidence of dose is required. And that's consistent with the National Academy of Sciences, the Health Physics Society, and even plaintiffs' own experts, all of them. So the starting point for any causation analysis is dose. All right. Thank you very much. Thank you for the additional time, Your Honor. Thank you, Mr. Phillips. Ms. Milberg? Good morning, Your Honors. On the duty issue, I have three points. First, the district court correctly decided the law that the standard of care in a Price-Anderson Act case such as this one is 20.106. And that 20.106 is not breached unless there has been an exceedance at the boundary of the restricted area. My second point is that the regulatory agencies on three occasions comprehensively investigated these plants, and on each occasion found that the regulatory limits at the boundary of the restricted area on an annual basis were within the regulatory limits. And that's what you see here. What was the boundary? What was restricted? What was unrestricted? Did that become a contested fact issue? There's no contested fact on the definition of a restricted area. A restricted area is a regulatory term. I know what the definition is, but in this case, was there a contested fact in terms of this factory, what was restricted and what was unrestricted? And specifically the roof area. The roof area, there's no disputed fact that the roof area was a restricted area. The Atomic Energy Commission considered it restricted. It was locked. It was accessible only from the plant floor. Were there ladders from the outside? There were no ladders from the outside. There was an inside ladder leading up to a locked hatch, which came from the plant floor, which was itself restricted. The plaintiff's expert, Bernd Fonke, acknowledged that the stacks were in a restricted area. The only evidence the plaintiffs had that the roof was unrestricted is a single letter from Newmark to the Atomic Energy Commission in which there's a typographical error. 66 letter. 66 letter. But that letter goes on, Your Honor, to describe the controls and locks that were in place. My position is that, contextually, it was a typographical error. It was not. That it was a typographical error if you read the letter. It has to have been a typographical error. And in 1968. The District Court spent 27 pages deciphering these facts. He spent 27 pages reviewing evidence that the plaintiffs proffered relating to stack readings, which are not the individual stack readings, some of which were high, and individual monitor readings, but for short periods of time. And he gave you the benefit of the doubt on every factual interpretation in those 27 pages, right? There is. What the District Court did was he carefully reviewed the plaintiff's interpretation, but each of the records the plaintiff proffered were stack readings, not boundary readings, no annual averages, and, importantly, the plaintiffs in this case have no expert evidence whereby they extrapolate the stack readings to what the concentration would be at the boundary. And that's essential because, as this Court recognized in its 1999 decision in TMI, figuring out what the dilution and dispersion formula is for these stacks is very technical. It's complicated. It's mathematical. You've got to look at wind speeds. You've got to look at wind direction. You've got to look at the diameter of the stack. You've got to look at how long it was running. What was the rate of the stuff coming out of it? What was the weather? What was the terrain? It's a complicated mathematical transaction, and they don't have an expert who did it. Their expert, Berne Fonke, looked at the stack readings and compared those to 106 limits. The stack readings are probably going to be the highest level you can get. They will be high, but there was significant dilution and dispersion going on at this point, as the AEC recognized. Well, the dispersion is going to happen the farther you get away from the stack. It happens to the roof perimeter, Your Honor. The levels drop down significantly. We were compliant at the roof perimeter. There's no member of the public at the roof perimeter. The closest they are is at the bottom of the roof, but we were compliant at the roof perimeter. The dilution factors for some stacks were 1,000-fold, and we were not close to the regulatory limits at the boundary even further out at the perimeter, even further out at the boundary where the public might actually be beyond the fence line, and that's undisputed. When the AEC went in, they went in in 1966 and looked at our roof edge monitor readings. They went in in 1969. They actually granted us a license amendment to allow us to release more 100-fold, release more at the stacks. Because we had demonstrated through three years of roof perimeter monitoring, there are levels at the roof perimeter were well within the regulatory limits, and our off-site limits were even lower. In 1995, the agency did a review of the entire operational history of the plant and again found that we were well within the regulatory limits. You've got to measure in the right place, which is where the public might be, and apply the correct limits, and the plaintiffs didn't either. Instead, they selected the stack readings, and their expert, Frankie, said comparing stack readings to 106, oh, the levels are high. We've never disputed that, but at the boundary, which is where you need to measure, the levels were within regulatory limits. Their second expert on breach was Dr. Ring, and Dr. Ring said that he couldn't, he didn't have an opinion that 106 was violated at the boundary on an annual basis. He couldn't say that it was. So they have no expert evidence, and their expert, Dr. Melius, said that the process of calculating what the dilution would be, the concentration would be at the boundary from the stacks, is something that's beyond his area of expertise. It requires specialized dispersion modeling, which he can't do, and they don't have an expert who did that work. Anything further? No. Thank you, Your Honor. Thank you very much. Mr. Bograd, rebuttal. Thank you, Your Honor. Why don't you start with the admitted facts? The councils in both their papers and today have referenced this to these facts that were deemed admitted. Why don't you start there? Well, Your Honor, they'd like to make a big deal about those facts, but those are facts related to evidence of dose by individual plaintiffs. And as we were discussing in the opening, we do not believe dose is a requirement in order to establish a causation. So we didn't oppose the data because we had not done a dose reconstruction on it for individual plaintiffs. Given the data available from the plant, we don't think there's a basis to do an accurate dose reconstruction. It's for that reason that we retained an expert to do the qualitative differential diagnosis, which the court found was more reliable than a quantitative reassessment would have been. Judge McKee, you asked about cases getting past summary judgment. The prior case involving this plant got past summary judgment, the Hall case. It went to trial. Plaintiffs prevailed. Plaintiffs also prevailed for judgment notwithstanding the verdict. A new trial was then granted because of some documentary evidence, and the case settled. But the evidence in the Hall case is virtually identical to the evidence here. I'd like to point to a few specific data. First, I don't think this case really turns on restricted versus unrestricted areas. Is that contested? It is very much contested, Your Honor. And in a letter that was sent from NMEC to Mr. Price at the AEC, which this is a JA-51-68. It's not the 66 letter, is it? No, this is the 64 letter. Page JA-51-68. NMEC says, first talking about the Raycord roof, the roof of the building next door, we realize that although the Raycord roof is legally an unrestricted area, in reality it is a restricted area by virtue of its extremely limited occupancy. Next paragraph begins, the same is true of NMEC's roof. So the position that NMEC was taking all along was not that legally the roof was a restricted area, but that because people were not regularly on the roof, they should be allowed to have greater releases of radiation, which was the basis on which they eventually got the 1969 amendment. The 1969 amendment was premised on the notion that you could have releases from the stacks that were 100 times the limits in Appendix B and comply at the roof edge. Dr. Frompe produced extensive data, which we produced at page 11 of the reply brief, of stacks that exceeded 100 times the level. Measured from the stack? Measured from the stack. But the whole premise for their license amendment was that if they kept emissions at the stacks below 100, they would comply at the roof edge. Were those discharges measured at the roof edge? Their roof edge monitoring, Your Honor, is remarkably incomplete and has lots of gaps and holes, and there's plenty of expert testimony in the record, including statements by the – I'm sorry, I see my time is finished. You can continue. Including statements from the Atomic Energy Commission that they did not believe that the – that they believed that the roof edge monitoring, because of failure to take into account wind and the like, was substantially understating the actual measure of emissions at the roof edge. But I also want to talk about the measurement. Your time is up, so quickly. Quickly. We cite numerous pieces of documentary evidence that show statements by NMEC admitting average yearly concentrations at their property line that exceed the permissible concentration in unrestricted areas. That's J5159. You know, during incinerator operation, airborne concentrations outside the plant, 4,000 times the maximum allowable and the like. And there's also evidence taken from these environmental monitors in the community that show radiation exposure substantially in excess of the Rule 20 limits. So the notion that somehow the fact that the roof edge monitors don't say that is the only piece of evidence they can use is wrong. All right. Thank you. You're welcome. Thank you. Would the panel would like a transcript prepared of the argument and ask that the parties share the cost preparation of it. I would like to thank all of you for your arguments in these various cases before us, and we'll take the matter under advisement.